Good morning, Your Honors. My name is David Nickerson. I represent Petitioner-Appellant O'Brien. I just hesitate where to begin in this case. I'm sure the panel is going to have lots of questions. It's a very factual, intense case. There are two issues. There's a Brady claim and there's an ineffective assistance of counsel claim. I was going to start from the counsel claim because I think it's the most complicated. I think the place that would be most helpful to me, and my colleagues may disagree, is with the state court's conclusion that regardless of what else happened or should have happened with counsel, that there was no prejudice. And for you to prevail, we would have to conclude that the state court's finding of no prejudice was objectively unreasonable. So that would be a helpful place for me if you could start, assuming that some of these errors were, in fact, fell below the standard. To answer that question, you have to understand state procedure. What the state court said was, under their own rules, under the habeas state rules, the state court says, I have to assume all the facts in your petition are true. Having done that, I find that you don't state a prima facie case for relief. That's a very low standard. The court never actually said that. It's hard to tell from the record that it ever actually did that. But if you assume all those facts are true, I don't understand how anybody can say there's not a prima facie case for relief. So can I focus you a little bit? I know exactly what you're saying, and I mean, Judge Graber is more familiar with that candidate case than I am. But it seems to me under that case, you would be at least entitled to an evidentiary hearing in the district court to basically flesh out whether, in fact, prejudice could be shown. But what would be helpful for me is if you just zeroed in on, let's assume that everything you said in the state petition was true, right? Okay. Because that's what the state court was supposed to have done. Right. So what new facts would have been added to the mix such that Judge Graber, Judge Friedman, and I could conclude that there's a reasonable probability that maybe a jury would have come out different? That's a very good question. And it may take me several hours to explain that. I know. Try to focus on that. If I had had more space in the brief, I could have given you a lot more details. Well, instead of apologizing, just start in. Okay. There's two ways of doing this. What was in the Hoagland report that defense counsel could have used and didn't? He essentially didn't read the Hoagland report. There was factual information in there that he could have used. And then over and beyond that, there was other factual information that he simply didn't investigate or present. So making that distinction, in the Hoagland report, there was information that Wellman told Detective Hoagland that the whole time I was within Mr. O'Brien's presence, he did not have a cell phone. So that's one fact the jury never heard, that all of these calls we're talking about which set a timeframe, well, those are not cell phone calls. Those are calls made from O'Brien's house. So that narrows the so-called gap in the alibi. But there was another witness who testified at trial that at least he or she, I can't remember which it was, did not ever see or didn't think that your client had a cell phone. Didn't think. But Mr. Wellman was there. And he said no. He did not have a cell phone. So therefore, all the calls had to be either made from his home or someplace else. Correct. That's one fact. That's one fact. Okay. Well, I have a list of them. I know. I got my list, too, but I want to see what you've got that maybe I don't. The whole time Wellman was at the house, when he claims he's at Mr. O'Brien's house, he never sees Mr. O'Brien on the telephone. So none of these calls that Mr. O'Brien made to various people occurred while Mr. Wellman was at the house. So that narrows the gap even further. They must have occurred before or after Wellman was there. So the gap again narrows. There's information in the Hoagland Report that about the route that was taken. In his first statement, Mr. both Wellman and Dixon, we're not sure what route we're taking. In the Hoagland Report, which Defense Counsel Clark gets the second day of trial, he says, oh, yeah, I remember I went down Farnari Road and we got off at the In-N-Out Burger and we went past the Walmart. When the detective Hoagland does his driving of the routes and timing them, that turns out to be a 47-minute route, and there's no 47-minute gap in the alibi. So if the jury had heard that, they would have said, well, wait a minute, this doesn't fit, because there was testimony from the detective that there was one route that was 36 minutes. Well, now this route is much, much longer. There was information in the Hoagland Report, and I think this is really important. For the first time, Wellman tells the detective, when we got to the gun shop, I saw that one of the employees was putting the, I think they were handguns, into the display case. Okay, after that conversation, the detective goes back to the gun shop and says, well, what does this mean? He just told us that when he arrived, they were putting them in the display case. But am I right, though, that one of the gun shop employees did testify at trial and said that those three people came in just shortly after the store opened? Yes, and this new evidence would have established, would have both reinforced that and probably would have established that that had to be right at or slightly before 10 o'clock. But that's what the guy, that's what the Yes, he said that. So that is cumulative. I wouldn't say it's cumulative. I would say it gives it a much more, Christofferson's testimony was, yeah, it was about, they were the first people in the door. That's literally what he said. They were the first customers that morning. Okay, what are the facts? That could have been 10-15. Well, that's 10 to 10-15, and the government said that the crime took place between 10-30 and 11-30. Right. But if the three men walked into the gun shop at 10 o'clock, Sean O'Brien could not have been one of those three men because, and it's undisputed, and the prosecutor put on testimony, he was home and on the phone with Frankie Solisi at 10-12. So how could he be in the gun shop and on the phone at the same time? It's just not possible. Okay, yep, got that. Okay. Facts. Still on the Hogan report. In fact, I think that's all I had on the Hogan report. Other evidence that could have been that wasn't produced. Can I ask just one last question? Sure. You began this by saying the defense lawyer never read the Hogan report. Is that your supposition or is that in the record someplace? That is my conclusion when you read the entire record. There's all this information in the Hogan report that never came out of trial.  I never said I never read the Hogan report. Okay. Go ahead. To the extent that anything in the Hogan report came out of trial, it came out because Wellman brought it up. Okay. Counsel, if you want to give us more facts that should have come out, please start doing that. There's a call, 11-14 call to Mike Carrick. Again, there's no cell phone. He must be at home. If Sean O'Brien is calling Mike Carrick at 11-14, there is no gap in the alibi because the prosecution at trial specifically argued 10-45 to 11-30. Okay. If he's at home at 11-14. No, no, I know. But counsel was deficient on that front because you say well, just help me with this. I'm firmly of the view that it would have been crazy to call Carrick to the stand given what statements Carrick had made to the police. The guy pleaded the Fifth anyway. You were not going to get the prosecution to be forced to grant him immunity. So what is it besides Carrick's testimony that would have been introduced had counsel performed confidently? Counsel, well, counsel had the telephone records. He got them by way of subpoena due sustainment. Carrick's phone records. Carrick's phone records. And the jury never saw those? Nope. The jury never saw them. He could have brought them in. They were a business exception. They could have come in through whoever had served the subpoena. And he could have brought that in through Detective Hoagland, who did testify. Who's the other guy who made the 11-47 call? That was. . . I can't remember his name. I can't remember his name. Did that person's cell phone records come in? Yes. They were there, too. Was that Petrie or something like that, or is that somebody else? Yes. I think it was Petrie. Petrie. Because back in the Superior Court, it's undisputed, and Carrick testified. . . There was two phone calls that morning to Carrick's phone, 11-14, 11-47. The prosecution said, well, O'Brien's call is the 11-47 call. Well, no, because if you get J.D. Petrie's records, he called Carrick at 11-47. It's in his phone records that he called and had a two-minute conversation with Petrie at 11-47. Since there's only two calls, the call that O'Brien made was the 11-14 call. It's indisputable. What are we supposed to do, though, with the competing Carrick declarations? What do I make of that? Yes, because it's awfully bizarre, isn't it? It's very bizarre. He was — his deposition was taken by a civil lawyer in a civil case. He signed the declaration, said, yep, here are my phone records. I got this call at 11-14. It was from O'Brien because I was still at school. I didn't answer the call because I was in class. As soon as I got out of class and got in my car, I called O'Brien back. That wasn't 11-47. That was 11-14. So it's inexcusable for defense. . . Well, I can't explain that. All I can say is all I can do is speculate that the prosecutor went to him and said, you've got to retract this, otherwise we have a big problem. Well, that's speculation. That's totally speculation. Other facts that you'd like us to think about? I wanted to mention that the defense counsel had said in his opening statement, I'm going to prove the 11-14 call, and then he didn't. Well, I mean, your client did testify. And I guess he said specifically it happened at 11-14. But it would have been nice to have him testify and say, showing you these phone records, is that the call you made at 11-14? And he would have said, yes, that phone record shows that's the call I made. I was at home when I made that call. So the last thing on my list is the 10-49 call. The 10-49 call to Winslow, who was an employee at his mother's automotive garage. And how that came about was Winslow mentioned it to Mr. Clark, the defense counsel, and said, I don't remember the exact time, but if I went back and looked at the records, the charge card records, I was talking to a certain customer when that call came in, and I have the charge receipt for that. If I go back and look at that, I can tell you when that happened. Well, the lawyer explained that, though. And why was that ineffective? Because I believe the lawyer's declaration was that the proposed witness was very unclear about the time and said, well, it could have been any time from 9-30 to 11-something, and I just don't remember and I don't keep a log, so I can't go back. No, that's exactly what he said. Right. But if I went back and looked at the records, maybe I can pinpoint it.  Okay, you're telling me this. Would you please go back and look at the records and see if you can pinpoint it? And then maybe this would be more helpful, because saying it's, well, sometime between 9 and noon is not very helpful. So was it ineffective not to ask him to go back and look at the records at that point in time, or was it ineffective not to ask him to go back and look at the records when he realized on the second day of jury selection that the government has changed its theory of prosecution as to when the crime took place? That's the more ineffective time, isn't it? Exactly. Because before. Because then it really would have helped. Right. Before that point, the defense counsel is being told all this happens afternoon, or at least after 11-30, so a 10-49 phone conversation is irrelevant. But, aha, now I understand Wellman's going to change his testimony and say it happened between 10-45 and 11-30. Maybe the Winslow call is important. Maybe it's not. But I've got to at least investigate that. Otherwise, he doesn't know. And it turns out it was important because there is no gap in the alibi if he had put on all the evidence. So getting back to the Court's question, that's the prejudice. If he had fully researched the case and presented evidence that was readily available, there is no gap. Maybe you should reserve your two minutes. I would like to reserve at least two minutes. You've got two left. Okay. Thank you. So that sounds perfect. We'll hear from the State. May it please the Court. Kenneth Sekoler for Respondent. I'm going to first address ineffective assistance of counsel, and then if there is time, I will address the Brady issue upon which supplemental briefing. So let me cut to the thing that troubles me the most about your position here, and that's the Kennedy case. Maybe that Nunes case as well. But those two cases, to me, stand for the proposition that the State court would have committed basically D-1 error if it truly had assumed all of the facts alleged in the State petition were true, but nonetheless said, applying Strickland, that there was no reasonable probability the outcome would have been different. And that's why we've asked counsel to sort of go through what would all the new So maybe you can just address that right off the bat. Why don't we at least have to send this back for an evidentiary hearing to see if, in fact, any of those facts can be proved? Well, I think that what the State court looks at on habeas in deciding whether to hold an evidentiary hearing is similar to what a Federal court looks at in deciding whether to hold an evidentiary hearing. So, for example, when a habeas petitioner claims a witness would have given certain testimony, the court doesn't assume that that testimony is true. They assume the allegation is true, that the witness would have given that testimony or that the defense would have produced that evidence. The court doesn't make an assumption that it's true. That would have been a trier-of-fact assumption. So if you look at this case and you have to look at all of the allegations as if that evidence came in, as well as the evidence that did come in, and determine Right. You look at all those allegations exactly in light of the evidence that did come in and all the circumstances surrounding the allegations. And if we're looking at, say, prejudice, how is it likely that the jury would have considered that? So, for example, the jury would have at all the evidence that Petitioner says that was that counsel failed to introduce would have been looked at in light of, first of all, all the incriminating evidence. The court, the superior court here on habeas ruled on all the ineffectiveness claims that there was no prejudice. So 2254d deference applies to the prejudice finding on all of the subclaims of ineffective assistance of counsel. And you can see the reasonableness of that starting with the what the California court of appeal had called the overwhelming strength of the evidence. In this case, we had. It wasn't overwhelming in the sense that, you know, this was just a slam dunk case. It was overwhelming in the sense that for Mr. O'Brien not to have been involved, he would basically have to have been a pretty unlucky guy to have all of these other witnesses all kind of converge and point the finger at him. In that sense, it's overwhelming. But it's not, you know, maybe there was some kind of a conspiracy to falsely name him to protect someone else. Who knows? But it's not like you've got, oh, there was DNA evidence found in the house that matches O'Brien. That would be an overwhelming case where notwithstanding whatever phone calls were made, probably no jury would have weighed the phone calls over DNA evidence. But here it's just a bunch of witnesses who all point the finger at O'Brien. And if he had this other evidence that showed it was physically impossible for him to have been in the various places at the times that the crime occurred, it seems to me maybe a jury would have had reasonable doubts. Well, I think Your Honor is right in saying it would have to be a massive conspiracy of these disparate witnesses to frame Mr. O'Brien. Because you had both co-defendants, well, you had both co-defendants who were on the scene testifying. One of whom got a deal, negotiated a plea deal in exchange for his testimony. Correct. So that's why we look for corroboration. Right. The witnesses corroborate each other. So the two witnesses, the two co-defendants corroborate each other. Of course, they're accomplices and we look for corroboration. We find abundant corroboration, first, in Mr. O'Brien's admission to his close friend, Chantal Michaud. Who was a girlfriend of one of the co-defendants, right? Dixon, yes. Also, his admission to his friend, Clifford Sargent, who that day of the murder he showed him the money and said he had killed someone for it. In the testimony of J.D. Petty, that he had loaned the shotgun to O'Brien that morning, he received it, he got it back later that afternoon with a box of shotgun shells from the Bighorn Gun Shop, which is the very shop that the two co-defendants testified. They bought the ammunition. It was missing a single shell that was consistent with the shell that killed the victim, Kyle Smelser. There were also testimony from additional witnesses, two additional witnesses that they got a call early that afternoon, late that morning. They received calls from O'Brien, said he had a large amount of money now and was seeking to get marijuana, to buy marijuana, which was, which further corroborated the co-defendants who testified that money was stolen. It's also corroborated by the undisputed fact that O'Brien had been to the victim's home before and knew that marijuana was sold there. That's the prejudice aspect. But I don't know. But that's what I said. I mean, you've got, sure, you've got a bunch of seemingly independent witnesses who are all pointing the finger at O'Brien, right? But all of them could be lying. It's possible. It's possible, but not. And if the jury had, in fact, been presented with evidence that, I don't know how rock-solid it was, but again, if we're going to assume that all of the facts alleged in the State habeas petition were true, it would show that O'Brien was at home at the time supposedly when the three perpetrators showed up at the gun store. He was at home at 1049 when, according to your, according to the State's theory of the case, the perpetrators were, you know, sort of en route or almost there at the house, right? And so it would have been physically impossible for him to have been part of the threesome. But, Your Honor, when we talk about the evidence that counsel supposedly failed to introduce, we don't assume what we assume is that that's the way the evidence would have been presented, that that petitioner would have testified that way. We don't assume for prejudice purposes that the jury would have believed it. We look at the strength. We look at the strength of that evidence. And I'm saying, in light of the fact that you, the State, had a bunch of witnesses, all of whom could be lying. It does seem somewhat improbable, given how many different people all converge. But nonetheless, they could be lying. And if the jury had been, had to balance that collection of evidence, no forensic evidence whatsoever connecting O'Brien to the crime, with this other evidence that showed that, boy, if you believe that, he could not have been part of this crime, maybe a jury would have had reasonable doubt. That's the assessment we're trying to make, right? And we look at, is it likely the jury would have believed that? Actually, what we look at under 2254d is, could a fair-minded jurist find that it's not reasonably likely the jury would have believed it? And in that sense, we need to address the individual pieces of evidence. For instance, let's talk about the fact that Detective Hoagland went on a ride to the murder scene and it took 47 minutes. Well, Hoagland himself said he didn't know what exact route the assailants took. Wellman never said he knew what route the assailants took. Hoagland merely said he took two, mentioned two roads that he happened to take, Forney Road and Green Valley Road, and that took 47 minutes. Is there any suggestion, though, that it would have taken less than 25 minutes to get to the robbery scene and do the robbery? I don't think there was any specific evidence on that. So if the gap had been narrowed in the way that Mr. Nickerson suggested it could have been with this other evidence about the phone calls, whether it's 47 minutes or 37 minutes or 32 minutes really doesn't matter. Well, I think then we go to how likely is it, could a fair-minded jurist find that Jurist, you mean juror? No. Actually, I'm talking under the Denver standard. You're talking about our standard of review, which is whether the State, whether a fair-minded jurist in our position would find it objectively unreasonable that the State court went where it went. Right. I'm using the Supreme Court's language from Richter, correct. It's far from certain. I think it's dubious that the jury would have believed the evidence about when these phone calls occurred, because I think the whole argument of Appellant here is premised on the notion that the jury would have believed that these phone calls occurred at certain times. There was evidence that Cellicci called O'Brien at 1011, but there was only evidence that the call was made. There was no evidence whether Cellicci actually talked to O'Brien at the time. Wait. I guess it wasn't you, but the prosecutor who tried this case conceded before the jury that O'Brien was at home until 1030. Okay? So I don't think it makes any sense to try to back up the timeline from there. I don't think he did, Your Honor. I think if you look at the argument, he assumed for the sake of argument that O'Brien was home at 1030, because the 1030 was based on a purported call that O'Brien had received from Chantal Michaud, the same person who testified about his admission. Michaud. I think that's why the prosecutor was compelled to say, well, I want you to believe her testimony, and she told you that it was at 1030. But she wasn't specific about what time. She thought it was approximately 1030. Mr. O'Brien himself said it was he thought it was approximately 1030. They were not specific. They were not committed at all to that time, including Michaud. She did not have any certainty as to what time the call occurred. So his argument was, let's assume, you know, worst case scenario, that's when the call occurred. Let me ask you about the 1049 call, because that seems to me, if believed by a jury, would be the most damning. So is your position simply that, well, in light of all the evidence, no reasonable juror would have believed whatever that guy's name was? I can't remember the name. Winslow. Winslow. Nobody would have believed Winslow's testimony that it actually happened at 1049. Is that your position? I think that a fair-minded jurist could conclude that it's not likely, and that's getting back to the original Strickland standard, reasonably probable, that it would have been credited in all light of all the evidence, for one thing. But how would you be able to make that assessment without seeing the testimony live from Mr. Winslow at an evidentiary hearing? How can you make a credibility determination that any reasonable jury looking at that guy would have concluded his testimony was totally incredible without at least seeing him testify? Well, you could say that if that was the case, Your Honor, then an evidentiary hearing would be required in every case where the Petitioner submits a declaration from someone, including a piece of evidence. Well, if you had DNA evidence putting O'Brien at the scene of the crime, obviously I think all of us sitting here would say, yeah, probably a jury would. Or maybe even if you had witnesses with a record a mile long or, you know, it is. Because we still look at it in view of the totality of the evidence. And a reasonable court hearing the claim on habeas can do so and can take into account, for example, the fact that this evidence didn't come out until 3 years after trial. It can also take into account the fact that when O'Brien was interviewed by the police just after his address, he recounted phone calls. He told them about phone calls he had purportedly received that day. He didn't say anything about this one. When he testified at trial, he went into great detail about phone calls he had received. He didn't say anything about this one. And again, the fact that Winslow had no idea when initially, when initially contacted, had no idea when the phone call had occurred. And that ---- Is there any, is there any, what's the relevance of these facts? Wellman gave two statements to the government. They were recorded. They were turned over. Then the defense turns over his alibi defense, complying with the California rules. Then the prosecutor goes back, takes another statement from Wellman. The defense has spent 10 months investigating the afternoon time frame. Takes another statement from Wellman. Lo and behold, doesn't record this one because the California rules require you only turn over written statements. Doesn't record it. Doesn't turn it over. Waits until jury selection. And then, by ambush, he says, oh, by the way, we're changing our entire theory. Now, isn't that an argument that this defense lawyer had no strategic choices left? You guys waited until the trial had started before you changed the theory he had spent 10 months preparing for. Your Honor, the evidence shows that he made, they turned it over two days later. Two days later than what? That's just not credible at all. The interview occurred on January 2nd, not February 2nd. I disagree, Your Honor. The record is clear. The interview took place on January 2nd. I disagree. Give us citations. Detective Hoagland testified under oath at trial that the interview had occurred on February 2nd. Wellman himself testified under cross-examination by defense counsel. Defense counsel asked him, do you remember an interview being interviewed by the police a couple of weeks ago earlier this month? This was on, he asked the question on February 17th. Counsel said, Wellman says yes. And then I think, and defense counsel asked him afterwards if it was on February 4th. And I think Wellman said it was on February 4th. Again, in redirect. You lost all credibility with me, that you would try to argue that this really occurred on February 17th. Well, that's the weight of the evidence. What they testified. I mean, you can look at the report, and just within the report, there are a number of things that Detective whatever-his-name-is says that could not possibly have happened on February 3rd. It had to have been January 3rd because it was the date after the interview. But if we're talking about the interview, I'm talking about the interview in which Wellman discussed the time period. Right. And then the detective goes and follows up some of the things that Wellman said, which would have had to have been your saying on February 3rd, and I'm saying that it would have to have been on January 3rd. I disagree. I think the evidence, given the sworn testimony of the witnesses and assertions of defense counsel himself during opening argument that the switch had occurred on approximately two weeks before, that the weight of the evidence is that that was a typo and that the interview had occurred on February 2nd, on or approximately February 2nd. That was the sworn testimony. And that was It's totally incredible. And I'm really shocked, actually, that you're trying to defend that. That's how it went down. That's how I see the evidence, Your Honor. But that doesn't answer the question. The question is then what For example, he says in the Hoagland report, which is dated January 2nd, that the day after the interview, based on things that Wellman had told him, they then went back to the big gun horn gun shop on January 3rd. So he says, we had an interview. Wellman told us these things. As a result of the interview, we went back to the gun shop. And he says that happened on January the 3rd. So by your – in your view, he is wrong every time he puts a date in this report. I think he was getting the months mixed up, at least with respect to the discussion. But I think we need to get back to this is part of an ineffective assistance of counsel claim. So let's assume, let's assume that the prosecution was tardy in disclosing the case. There still has to be a showing that counsel committed ineffective assistance by failing to object, and that the objection likely would have changed the verdict. And Well, the objection was the thing that he didn't do was to ask for a continuance. And there has been no showing whatsoever of any likelihood that a continuance would have resulted in a more favorable verdict. That is utter speculation. And 10 months developing an alibi. It's a – it's a conclusory claim. On habeas corpus, the Petitioner has to make a showing as to – would have to make a showing as to what a continuance would have accomplished. He needs to show a reasonable likelihood that the verdict would have been different. And in fact, counsel stated a tactical reason for not – Reasonable likelihood that there would have been an acquittal or a hung jury. Correct. Or in some cases, a lesser included offense, but this isn't one of those cases. Counsel had a tactical reason. He thought not – for not asking for a continuance, he thought that he was – He said he could do a better job of attacking Wellman because he kept changing his story. Right. That was his – he stated on the record he had a tactical reason, which was to aggressively cross-examine Wellman about that and highlight that for the jury, and that's exactly what he did. And as the Court is well aware, great deference is paid to counsel's tactical decisions, and they are doubly deferential under habeas. But again, there's – it's utterly conclusory that a continuance would have changed anything. There's been no showing whatsoever as to how that would have affected the verdicts. Counsel, you have exceeded your time, and I know we've used a lot of it, but we – I think we understand the State's position. Thank you. Thank you, Your Honors. Mr. Nickerson, you have a bit of time remaining. I have two minutes. And two seconds. Starting at the end first, the tactical decision could have been a reasonable decision if he had actually done what he said he was going to do. What the jury never heard was Wellman only changed his story after I had given the prosecutor the alibi evidence. Wellman testified, in fact, that he changed his story because he was sitting in the county jail for 12 months, and while he's sitting there, his memory got better. That's what he told the jury. What he should have cross-examined Wellman on is, hey, you only changed your story after I proved your story was wrong. That's why you changed your story. If the jury had heard that, they would have questioned Wellman. And not to completely change the subject, but that's why the Brady violation is so important, because the coroner corroborated Wellman and made Wellman look like a reasonable person. I know this was not certified, but there's a Claim 3 that's discussed in the opening brief, which explains to you why Wellman changed his story. I can't address every piece of evidence that the prosecutor used. Let me just focus you, then, because I mean, I think the State's strongest argument here is that if your client wasn't involved in this crime, he's got to be the unluckiest guy in the world to have five, six people, some of whom were his friends, all just independently point the finger at him? That's what the prosecutor's been saying since the beginning, and that is not true. They were not Mr. O'Brien's friends. They were friends with each other. And even in Wellman's story, he says, several days later, I went over to Dixon's house, and they're all standing there discussing this, and they're all trying to ‑‑ it's incredible that they all say, well, we put two and two together, and we came up with it. It must have been O'Brien that did this. They were not O'Brien's friends. It's all over the record. It's kind of hard to explain. But they weren't his friends. Just say that they were ‑‑ They were friends, Tyler Dixon, Wellman, Petty, they were all friends of each other. Carrick, they were not O'Brien's friends. Okay. But you're conceding that for your client's theory of this case to be right, all of those people basically got together and conspired to falsely point the finger at him, right? Yes. And that's what you have to believe. Yes. And if you look at Claim 4, you can see how that actually happened, because the police went to Chantel Michaud, I think is how you pronounce her name, and they said, well, we know Sean is involved in this, without saying Sean O'Brien, and we know Tyler is, too, but we don't know Tyler's last name. Do you know who Tyler is? And she says, no. The very next day she runs to school and tells Tyler Dixon they think you're involved, Tyler Dixon, and they think Sean O'Brien is, too. Tyler goes in that night to the police and says, yeah, it was Sean O'Brien, it wasn't me. How did he come up with that? The police told Chantel that, and Chantel told him that, that the police think Sean O'Brien did it. That's how this story began, and it snowballed from there because Sean O'Brien suddenly disappears from the scene because he's taken to Oregon for rehab, and nobody knows where he is, and they start talking about, well, Sean disappeared, he must be on the run. He must have been the one that did it, because all of a sudden he's gone. Well, they didn't know he was taken to rehab, nobody knew that. So to say it was a massive conspiracy, no. It was a bunch of 16-, 18-year-old high school dropouts saying, what happened? Well, it must have been Sean O'Brien. And, in fact, in Wellman's first story to the police, he says, yeah, we just thought we could come in and say that Dixon and I were there to commit a burglary, and Sean is the one who killed everybody. And, therefore, we're good for the burglary, but we had nothing to do with the murder. Thank you, counsel. Thank you, Your Honor. Both of you have presented very interesting and helpful arguments, and we The case is submitted, and we are adjourned for this morning's session. All rise. This court for this session stands adjourned.
judges: Friedman, Graber, Watford